Thank you. Good afternoon please be seated. The last case today is People v. Keller. That's case number 4160251. For the appellant Lou Viveretto and for the appliant David Robinson please be seated. Thank you. May it please the court, Mr. Robinson, Lou Viveretto appearing on behalf of Brad Keller. This case as you're aware involves whether or not the stop of Mr. Keller's vehicle was justified based upon specific and articulable facts that warranted Deputy Duvall to stop the vehicle and whether he had a reasonable belief at the time those facts came to his attention whether Mr. Keller had committed some violation of the law. There are a couple of facts that differ whether they're based upon the findings by Judge Lewis, based upon the testimony of the deputy, or based upon some of the exhibits. So I'll address those first. As you're aware Judge Lewis initially granted the motion to suppress the evidence that was obtained following the vehicle stop and in doing so he found that the deputy observed no more than defendant's vehicle parked in the middle of a public road. When you say that, that seems to suggest that, so what? Isn't it a crime to park your vehicle in the middle of a public road? So the finding there, although Mr. Keller of course agrees with the court's initial ruling granting the motion, calls into question whether the vehicle was parked, stopped, or standing in the roadway and if it was one of those three circumstances, was it in the middle of the roadway? And this is why I say some of the findings of the court differ from some of the testimony and don't seem to be supported by some of the exhibits. Did the officer say, I saw this car stopped in the road and a guy standing next to it and it appeared like he might be urinating? He said, I don't know where the vehicle was positioned in the roadway. He also said, I didn't see the person urinating. So there are questions regarding the testimony. Even if he had a reasonable suspicion that it was in the middle of the roadway and a reasonable suspicion that the defendant was urinating, isn't that enough? Stop the vehicle? Having observed those two things? Well the question is, did he observe those? Could he observe those? Well he said he did, didn't he? Depends on which part of the transcript you look at. How about any part? Well I don't think that we can select one part and disregard another part. I think we have to look at the totality of the evidence. Why not? Because it questions the credibility of the witness. Didn't the trial judge make his findings and isn't that enough for us? Well he initially made findings. But we're not reviewing his initial findings, are we? Well you're reviewing whether or not his findings are against the manifest way to the evidence. Well we're reviewing the findings he made after the petition to reconsider. Isn't that right? And there are differences between those findings and the testimony in the evidence. The findings that are critical to his reconsideration are set forth in his order, entitled Order on Motion to Suppress. And among those findings are that in his order, rather than the way he phrased it in his initial ruling, that is the deputy observed the vehicle parked in the middle of the road, he says it appeared to the deputy that the vehicle was parked near the center of the roadway. Pausing right there. What's the problem with that? Why isn't that enough? Because the deputy, when he's asked about that, testifies that he couldn't say where in the roadway the vehicle was positioned. The trial judge says the deputy said it appeared it was in the middle of the road. Why isn't that the beginning and the end of our inquiry? Because the court on review is entitled to take a look at all of the evidence that was presented and determine whether or not Judge Lewis's findings are contrary to the manifest way to the evidence. And what I'm suggesting is when you do that, including the exhibits, specifically the video recording, which is Exhibit 3, and the still images from that video recording, which is Exhibit 5, what you will see is that in Exhibit 5, the recording now shows that there are some taillights visible on Sherry Street. And you can also see in the foreground the headlights from the police officer's vehicle. Counsel, let me ask you this. What about the left turn into the cemetery without the use of a signal? That presumes that there was a left turn off of Sherry Street, and that's one of the other factual findings that Judge Lewis made that I think is called into question by the exhibits. And that is Judge Lewis, in his findings, says that the vehicle travels westbound on Sherry Street, and the testimony is that Sherry was an east-west roadway, and turns left from Sherry Street into the cemetery. Exhibit 1 that was admitted in evidence shows Sherry Street as a westbound roadway, shows Maple Street as a westbound roadway. The officer testifies that public roadways are accessible from the cemetery, and he doesn't know whether or not the public roadways continue through the cemetery. So there's a question whether Sherry Street simply continues westbound rather than turning and going eastbound, because that east-west roadway is Maple Street. So the exhibits and the testimony, when considered together, suggest that there are some assumptions that are being made How could he have gotten to the cemetery if he didn't turn into it? I don't understand. Bring it a little closer, maybe I need to see it. Approach the bench if you would. When you read the transcripts of the testimony, you probably noticed that the deputy first thought the vehicle was on Maple Street, but then corrected himself and said no, I was wrong, it was Sherry Street. So Sherry Street is south of Maple Street. Both of them are east-west roadways. Maple Street is an east-west roadway. Sherry Street is an east-west roadway. At some point in time, one of them ends. Whether it's Maple Street that ends or Sherry Street that ends, we don't know. I asked the deputy, are these public roadways in the cemetery? He said, I don't know. He did say public roadways are accessible through the cemetery. So are you saying that one of the roadways actually runs into and becomes part of the roadway in the cemetery? Sherry Street does. So a signal was not required, is what you're saying. But it sounds like all of this boils down to credibility, which was a determination for the trial court to make. Well, the trial court initially made it when the judge said all that the deputy observed, those facts that he could articulate, was that he saw a vehicle, and Judge Lewis characterized it in his first ruling, as parked in the middle of a public road. Why do we care about the first ruling? We're reviewing the second, are we not? We are. So then why do you keep citing to the ruling that the judge changed? Because you can see the differences between the language. Why does it matter? It just shows that there is some uncertainty also on the part of the court concerning what the factual findings are. We're reviewing the ruling the judge made. Why shouldn't we accept it? If we disregard that first language from the ruling where he grants the motion. That's why it's called a motion to reconsider. Maybe the judge got smarter. Well, he did reconsider. Okay. And he did reverse himself. By God, we can't let him. Is that your argument? Not at all. Then why do we care about the first ruling? I'll no longer refer to the first ruling, and I'll focus on the second ruling. Okay. In his findings with regard to the ruling on the motion to reconsider, he then says it appeared to the deputy that the vehicle was parked near the center of the roadway. Now, if we end the inquiry there, there's not much more to talk about. Works for me. Doesn't work for Mr. Keller because that's not what the evidence is. The evidence is when the deputy was questioned then about how he came to that belief or that conclusion, what he said is, I can't say where within the roadway the vehicle was. So the trial court messed up again by accepting that first statement? If the trial court messed up. If it's written order, it messed up again. But what the trial court did was apparently did not consider the inconsistency between the deputy's testimony. So he thought the trial court says, here's the judge, the deputy say it appears he was in the center of the road, and cross-examination, the deputy says, well, I can't say exactly where in the road he was. That's enough to eliminate the first, it appeared he was in the center of the road, and the trial court is not entitled to give any credit to that statement. I'm not asking the court to end the inquiry there. What I'm asking the court to do then is take a look at the exhibits. And were the exhibits presented to the trial court? Yes. So he messed up there too. Apparently. Just one more example. You just can't get this right. I would like to believe that every time a trial judge issues a ruling that it's accurate, it's based upon the law and the facts, you know better than I whether that's the case. That's why I got in front of the appellate courts. And that's why we're here. Okay. The video recording, again, shows the position of the vehicle. Now, an objective examination of that video recording, this is when the officer's headlights are illuminating the roadway, which suggests you can't tell where the vehicle was in the roadway. And frankly, perhaps an objective viewing of the video recording would suggest that it's on the right side of the roadway because at least there is a marker visible in the video recording. There's a sign visible in the video recording. And although you can't see where the surface of the roadway is, so you can't really tell where in the roadway the vehicle was, which may well explain why when the officer was asked, do you know where in the roadway the vehicle was, he said, I don't. And so are you suggesting that there's the possibility that the vehicle was properly on the side of the road? I mean, somewhere other than just on the roadway? Because I don't really see the inconsistency between saying stop somewhere in the road versus I can't tell you exactly where in the road. The statute that the deputy relied upon is a statute that provides for parking, standing, or stopping a vehicle outside a business or residential district. But if we disregard that and we just say, look at the other parking regulations to see if the vehicle was appropriately parked or stopped or standing in the roadway, those regulations refer to shoulders, curbs, those sort of things. The deputy testified, there's no curb, there's no shoulder, there's a ditch. When you get off the roadway, you're in the ditch. There's no prohibition along that roadway for on-street parking. At least the deputy says, I'm not aware of any prohibition, and there's no signs that he's aware of. So the mere fact that the vehicle may have been parked, according to the deputy's own words when he tells another officer, he was parked there alongside the roadway, doesn't establish reasonable grounds to believe that a violation occurred. And if it is alongside the roadway, then the only question is, was there room for passage around the stopped, standing, or parked vehicle for other vehicles? And the officer said, I can't say one way or the other whether another vehicle could have gotten by or not. Now, all of this is very similar to People v. Gray. In People v. Gray, the arresting officer first testifies that the vehicle was pulled off the highway onto a street, but the way the vehicle was positioned, it was partially blocking the street. That was his initial testimony, apparently. But then he admits that he did not know if there would have been enough room for another car to have gone around the vehicle. The trial court in Gray determined there was no traffic violation. The appellate court also posed some questions. Where exactly was the defendant's vehicle on Prairie Street? Why was that question posed? Because initially, the officer says, the vehicle was blocking the street. Then he says, he's not sure it was blocking the street. He doesn't know whether or not there was room for passage of other vehicles. The appellate court asks, were the right-hand wheels as close as practical to the edge of the right-hand shoulder? Apparently, there was a shoulder on Prairie Street. There is no shoulder on Cherry Street, according to the deputy. The court then says, based upon the facts known to the officer at the time of the stop, there was no basis for believing that a traffic violation had occurred. And reiterates, and in doing so says, the state did not sustain its burden of establishing the facts available to the officer indicative of a violation. The officer could not say there was not enough room on the street for other traffic to pass. The officer did not testify that the wheels were not as close as practical to the shoulder. There was no testimony that the police in that locale ever write tickets for stopping on a roadway or blocking a street. But how is our case impacted by the fact that there is no shoulder, there is no curb? So, you're either in the street or the ditch, according to what you're saying. According to what the testimony was, yeah, either you're on the roadway or you're in the ditch. And it was the deputy that offered that. He said there's no shoulder, there's no curb, there's a ditch. So, isn't that improper to be stopped on the roadway? No. As long as, it would be improper if there was a curb and the vehicle was not in the proximity related by the statute to the curb. Or there was a shoulder and the vehicle wasn't within that proximity referred to in the statute. But if none of those exist, and there's no prohibition with regard to on-street parking, then all the statute requires is that there be room for passage of other vehicles. And that's one of the questions that the court, the appellate court, raised in Gray. So, what I'm suggesting to this court is that the circumstances in Mr. Keller's case are very similar to the circumstances in the Gray case. And on behalf of Mr. Keller, I'm requesting the court to carefully consider and examine the exhibits here, consider the parallels between Mr. Keller's case and the Gray case, and then based upon that consideration, decide this matter. Thank you. Okay, thank you. You'll have rebuttal. Mr. Robinson, please proceed. Thank you, Your Honor. May it please the court. Mr. Viverito, I want to address three things right away. The first of which is I want to point out that I was raised Baptist, so I do take issue with Justice Stuyvesant's representation that God invented the appellate court. I blame it on the Supreme Court. Mr. Viverito does a great job of presenting a trial court motion to this court. His presentation is fantastic and, frankly, convinced the court the first time around. The second time around, the court got it right, and I'll explain to you why. It examined the totality of the circumstances, taking more time. Let me answer and just take one issue off the table, answer one question Justice Holder-White had early on about the signaling into the cemetery and why that means absolutely nothing. Of course, that gave the officer reasonable, articulable suspicion to stop him. There was plenty of articulable suspicion to stop the suspect at that time, defendant now, earlier on. But I believe Justice Turner actually wrote the case that came out several months ago. I think it's Theus. Turning on a signal from a private drive may not be illegal, but it certainly rises to the level of reasonable articulable suspicion. I think, as Justice Turner pointed out in that case, based on the Supreme Court case, Hine v. North Carolina, you don't have to be right, you just have to be reasonable. It might be a great defensive trial, but it means nothing in a pretrial motion. So I think that takes care of the signal issue. Of course, there's reasonable suspicion to stop him for turning. Okay, except for I thought Mr. Viverito was arguing that there was really no evidence that there was a turn, ergo no signal was needed. Yes, I believe he's arguing that, but I disagree that there was no evidence. The fact that he just had to approach the bench and show you the map, as he would have done if you were a trial judge, presents the fact that there was an issue as to whether he had to turn in there. And if you watch the video, and that sort of leads to my next point about what the testimony of the officer was, means absolutely nothing in this rare instance, because there was video and audio recording. How do we know what Officer Duvall or Deputy Duvall saw that night? It was on video. So what he recalled weeks or months later, as a trial judge, you would recognize means almost absolutely nothing. And I know this because I've recently been drafted into the arena of the trial court in some special prosecutions, and I know how these pretrial motions work. You represent to the judge what you know at the time, and you're not sure what your officer's exactly going to testify, particularly in a small county like Clark County. The judge gets it wrong. You politely ask the judge to reconsider and say, oh, by the way, when you're reconsidering, take a look at the dash cam. And when you look at the dash cam, what you'll see is that Officer Duvall approaches the car. The defendant rolls down the window and he says, was that you taking a leak back there in the road? And you know what the defendant says? Yes, sir. That's how the trial court knew what happened here. Putting together the pieces of the officer's testimony, recognizing for what it's worth and what was a misremembrance or a misunderstanding by the officer, combining that with the map, the great argument by defense counsel, as well as the video presented, the court reconsidered and determined, yes. In fact, there was reasonable suspicion. And why did the court feel in this case that there was reasonable suspicion? Because the touchstone of the Fourth Amendment is reasonableness. This court talks about it all the time. In fact, in People v. Lake, Justice Steigman wrote about this in a case that Justice Holder White concurred it. That was a case where the officer was tapping the suspect on the shoulder. This court said, and I quote, The overarching standard of the Fourth Amendment is reasonableness, which is measured in objective terms by examining the totality of the circumstances. What are the totality of the circumstances here based on what the court found, which is reasonable based on what I just presented about what was presented to the trial judge? One, a car is parked, quote, in the middle of the street. That's a quote from the court. And two, the officer observed what appeared to be, doesn't matter if it's true or not, that's Hine v. North Carolina, what appeared to be someone urinating in the street next to the car. He could have been just getting out because he opened the door and something fell out. Well, that can be ferreted out at a trial. That means nothing vis-a-vis reasonable articulal suspicion. So this brings me to a point that I wanted to make about the correlation of Terry stops and community caretaking, where those two things meet following McDonough. As this court's aware, and I know this is the last argument of the day, so I don't want to belabor this point, but I do want to launch this as the opening salvo in what will be the state's position as to reasonable suspicion in community caretaking. And I think this case is the right case to do it. There are three tiers for police-citizen encounters. One, probable cause. Two, Terry stops. And three, consensual encounters. Now, when Louderman came out, which was the case that preceded McDonough, the Illinois Supreme Court said, well, we're conflating community caretaking with these sort of consensual encounters. Between Louderman and McDonough, the court said, uh-oh, I think we messed up. Actually, what we meant to say was that community caretaking is, for constitutional purposes, like a Terry stop. Because, as this court just recently pointed out, and the name of the case escapes me, I apologize. It's a case from the U of I where, I think Justice Kinect was the author, where someone had pulled into a lot, the police had followed him, he pulled into a lot, and the police officer, I think Justice Steigman was on the panel, knocked on the window, and, of course, that was a seizure. But that seizure was justified as community caretaking. I think it was Winchester. Winchester. Thank you, Your Honor. I apologize for that. So, basically what we're talking about here is, just to frame it for the court, community caretaking and Terry stops are analyzed essentially the same way, because they're both seizures. So, when you're talking about reasonable articular suspicion, the framework is totality of circumstances. So, when you're dealing with community caretaking, you're also dealing with totality of circumstances. And why did the court say that in McDonough? Because the point that they were trying to make is, sometimes these things overlap. Sometimes you're community caretaking and you have reasonable articular suspicion to stop someone. So, for example, when someone's speeding down the interstate highway, and this is a point that Mr. Viverito makes in the reply brief that I think I want to correct for the record, which is, you don't lose reasonable articular suspicion when you pass by and you see that suspicion, and then it goes out of view for a short time, and then you find the car again, right? If that were the standard, then every time someone speeds down the interstate at 78 miles an hour, and then the police officer safely moves into traffic, and by that time, of course, we know from common experience that everyone on the interstate slows down to 45, right? Now, no crime is being committed, so you can't pull the person over for speeding. That's an absurd standard, and that's what the Supreme Court recognizes in McDonough and says, there could very well be an instance where, when you pull someone over for going 110 miles per hour, you have reasonable suspicion to believe that they have committed a traffic violation. But guess what? You're also community caretaking, right? Because that person's dangerous, and that's why this comes up in the context of DUIs. Because, as in this case, and you might wonder why I cited Schaefer in my opening brief in this case, because I think it's important. In Schaefer, you'll recall, and this is a case that Justice Steigman authored as well, that was an anonymous tip, quasi-anonymous tip. It was the drive-through person at a Wendy's, called and said that the defendant was causing a, quote, don't be drunk in the drive-through. That was relayed to a dispatcher, we'll call it the third person, to the second person, the law enforcement officer in the car, who didn't witness any of it, right? And in that case, in Schaefer, the trial court actually granted the defendant's motion to suppress in that case. We appealed it, and this court said, what are you talking about? That's a reasonable suspicion, right? It doesn't have to be right, it just has to be a reasonable suspicion. And the reason why, based on the totality of circumstances, that was the right call, is that even if the officer doesn't see it, although he did see it in this case, or what he perceived was the case, is that that folds into community caretaking. If someone calls 911 and says, hey, there's someone drunk and causing a disturbance in the drive-through at Wendy's, and here's the description of the car, and you pull them over two miles away, isn't that what we want police officers to do? It's always a balancing test. Again, the touchstone of the Fourth Amendment is reasonableness. And it's not unreasonable, based on a call like that, or a situation like this, to have a police officer momentarily detain someone to assure himself or herself, as the police officer, that everything's okay, no one's hurt, and no one is making society unsafe for someone else. Totally reasonable. On that note, I would only add that I think there was some talk in the reply brief about how the fines of the court were docket entries. That issue was resolved in 1994 by the Illinois Supreme Court in People v. Brooks. That's 158 Illinois 2nd, 260. Those docket entries are, one, presumed correct, and two, are orders to the court. This court doesn't have any questions? Thank you, Mr. Robinson. Any rebuttal? Yes, thank you. The reference in the reply brief to the findings relates to whether the findings referred to by the state were the findings of Judge Lewis or some other judge. Judge Lewis heard the evidence that was presented at the hearing on the motion to suppress. There was also a motion to suppress statements. Judge Resch heard that motion. Those findings that the state set forth in its brief are the findings of Judge Resch that are really dicta with regard to the motion to suppress. So when Judge Resch, in his record sheet entry, refers to the vehicle being in the middle of the road, Judge Resch didn't hear the motion to suppress evidence. He wasn't present when the deputy testified and the exhibits were admitted. So that was the reference to the findings. The findings of Judge Lewis are the findings that are relevant here, not some dicta that Judge Resch may have put in a record sheet entry with regard to a motion to suppress statements. With regard to community caretaking as justification for the stop, the Illinois Supreme Court said one of the elements of community caretaking is the officer is involved in a function other than the investigation of criminal or potential criminal activity. And the testimony in that case was that the officer didn't suspect anything. He thought maybe the person was having vehicle problems, as I recall, or something along those lines. So it was more like a roadside assist. Here, the testimony and the exhibits specifically provide that the deputy notified the dispatcher that he was stopping a suspicious vehicle. He was not stopping a vehicle because he thought the motorist was having vehicle problems or in need of some assistance. He was stopping it because of his belief that something suspicious was going on. So what's wrong with that? There's nothing wrong with it. It's just not community caretaking. Is it a Terry stop? I mean, aren't we looking at here, the officer, not maybe in the middle of the road, maybe impeding traffic. He can articulate that he thinks maybe the guy's out urinating, which would probably be disorderly conduct. He drives through there and sees a wet spot in the road, which would tend to corroborate what his belief was. Then the same vehicle goes into a dark cemetery and stops. Why isn't that, the totality of those circumstances, enough for the officer to approach the vehicle and ask what the driver's up to? For several reasons. First of all, I can't wait to hear them. Well, I'll be glad to share them. I'd like to hear them. The officer is supposed to point to specific and articulable facts, not assumptions. He sees a wet spot in the road. It's August. Well, he sees that, he says, as he's been following the vehicle. It's August. It should be no surprise if you got your air conditioner on and you're stopped, the condensation from your air conditioner is going to be on the road. So he's making assumptions. It's a fact, though, that there was water on the road, right? The fact is that he testified he saw a wet spot. Okay. That's the fact. So he's making assumptions. The vehicle pulls into a dark cemetery. The testimony is there's no streetlights along the road. The road was illuminated by the officer's headlight. So it's like saying he was driving down a dark road. There are assumptions and suspicions, but it takes more than that. Was it a dark cemetery? Well, sure. Isn't that a fact? Well, it's a fact that the road was dark. I understand that. And it is not established whether or not the road that the vehicle traveled on to enter the cemetery was Cherry Street or not. So Cherry Street was dark before the cemetery. Cherry Street may have been dark in the cemetery. So all of these things may rise to suspicious events, may create hunches, but are they specific and are they facts? Not assumptions, not I thought. They have to be facts. The third thing he didn't cover, it is a fact the car was stopped. Whether or not it's exactly in the middle of the road, we don't know, but it was stopped. That's a fact. And if it was alongside the road, as the deputy told the other officer, it's not a violation. And if it's not a violation? In fact, Mr. Robbins said, no, it doesn't have to be a violation. That would be decided at trial. The question is whether there is reasonable suspicion to stop the vehicle. And the reasonable suspicion arises from specific and articulable facts that justify a reasonable belief that an offender is guilty of the offense. So it appeared to me that he was urinating in the road. It appeared to me that the car was in the middle of the road. Your position is that's not enough if it's demonstrated that that was a reasonable calculation on the part of the officer. Well, I would ask you to consider whether it's reasonable when on the one hand he says that, but then when he's asked, tell us essentially whether you could tell if it was in the middle of the road or not. He says, no. Tell us, did you see the person urinating? And he says, no. Is it reasonable to say it appeared? It would seem as though if the officer's going to articulate facts, he's going to say, I saw this guy standing next to an open door of his vehicle and I saw some liquid being deposited on the roadway. I mean, those are facts. All he says is, I saw somebody standing outside the vehicle. There's no reasonable basis to believe that at the time he stopped the vehicle, he could articulate facts that the person committed some violation of urinating on the roadway. He didn't articulate facts. So all I'm asking the court to do is take a look at the evidence here, and just like in the Gray case, where the officer on the one hand says vehicle's blocking the roadway, and on the other hand says he didn't know whether or not there was a passage for other vehicles, the court looked at all of the facts, didn't just select the ones that happened to be consistent with the ruling that the trial court made. That's why we're here. I'm asking you to examine all the facts, all the evidence. Thank you. Thanks to both of you. Good arguments. The case is submitted. The court stands in recess until further call.